**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA,

v.                                                      Case No. 8:24-CR-38-KKM-NHA

CHRISTIAN LOUIS AVILES ROMAN,

      Defendant.

_____

## <u>ORDER</u>

A grand jury indicted Christian Louis Aviles Roman for drug offenses, including possession with intent to distribute cocaine. Indictment (Doc. 1). After his arrest, a magistrate judge ordered his release pretrial. Release Order (Doc. 41). The United States moves to revoke the order. Mot. (Doc. 42). After conducting a de novo hearing, I conclude that no combination of conditions would reasonably mitigate Roman's risk of flight or danger to the community. Thus, I grant the United States' motion to revoke the order releasing Roman pending trial.

## I.   BACKGROUND

At the hearing, the government offered testimony and evidence from Officer Christopher Holland of the Pasco County Sherriff's Department, who was detailed to the Postal Inspection Service at the relevant time. *See* Hr'g

Minute Entry (Doc. 49) (hereinafter "Hr'g"). The following is a summary of the government's evidence related to the investigation that led to the indictment, which the defendant did not rebut at the hearing (although, at times, his counsel questioned some inferences on cross examination).

In July 2023, Postal Inspectors found cocaine inside a package shipped from Puerto Rico to Zephyrhills, Florida. Mot. at 1. Officer Holland testified that he conducted a "controlled delivery" in which an undercover officer posed as a letter carrier to determine the identity of a package recipient. Hr'g; Mot. at 1–2. The package was delivered to the home of Roman's cousin, who accepted the delivery. Mot. at 2. Officers detained her outside the house, and she expressed willingness to cooperate. *Id.* She explained that she received packages on behalf of her cousin, Roman, who paid her between $500 and $1000 per shipment. *Id.* This was her fourth time relaying a package for Roman, who also sent them to her mother's house. *Id.* The cousin allowed the officers to look through her phone, where they observed a text message between the cousin and Roman indicating that she had possession of a previous package that she had picked up for Roman from her mother's home. *Id.* With her permission, the officers entered her home, retrieved and opened the package, and found a kilogram of cocaine hidden in a board game box. *Id.*

According to the government, Roman's cousin coordinated with the officers ahead of Roman's collection of the package. *See id.* at 3–4. The two

2

spoke on the phone about the delivery, and Roman asked where he should leave the money. *Id.* at 3. At about 6:59 p.m., Roman arrived at his cousin's house in a car registered to his fiancée, Kristal Del Rocio Ramos Ayala. *Id.* Roman drove past the house and called his cousin. *Id.* He correctly suspected that a Ford Explorer on the street was a "cop car." *Id.* Roman drove away and returned about twenty minutes later, but did not stop because he was suspicious of another car, which also belonged to the police. *Id.* At about 7:51 p.m., Roman returned and pulled into the driveway, where officers attempted to box him in. *Id.* at 4. Roman fled in the car and yelled, "You set me up!" over the phone to his cousin. *Id.* An officer began to pursue him, but gave up after Roman nearly hit an elderly pedestrian with his car. Hr'g.

On January 25, 2024, a grand jury in the Middle District of Florida charged Roman with three offenses: conspiracy with intent to distribute cocaine, (Count I), as well as possession and attempted possession with intent to distribute cocaine, (Counts II and III). Indictment at 1–2. Unaware of his whereabouts, the United States did not arrest Roman until more than a year later when Roman was serving time in state custody. Mot. at 5; Doc. 14. Roman moved for release pending trial, and the magistrate judge granted his motion. *See* (Docs. 36, 41). The United States moves to revoke the magistrate judge's order, Mot., and Roman responds, Resp. (Doc. 45). On January 27, 2026, I held a de novo evidentiary hearing on the matter.

## II.   LEGAL STANDARD

Under 18 U.S.C. § 3145(a), upon the motion of the government or the defendant, a district court must promptly determine the propriety of a magistrate judge's order. The district judge may adopt the order or convene a de novo hearing. *See U.S. v. King*, 849 F.2d 485, 490–91. I chose the latter and rely upon the papers as well as the evidence and arguments presented at the hearing.

Pretrial detention is warranted when no condition or combination of conditions of release would reasonably mitigate the risk that the defendant flees, endangers others, or endangers the community. *See* 18 U.S.C. § 3142(e); *see also King*, 849 F.2d at 487 n.2 (explaining that "danger" in the Bail Reform Act "has a much broader construction than might be commonly understood," and encompasses the danger that the defendant commits a crime harmful to the community). Ordinarily, there is a presumption *against* pretrial detention. *United States v. Salerno*, 481 U.S. 739, 755 (1987). A handful of carveouts shift this presumption, including when "there is probable cause" that the defendant "committed . . . an offense" under the Controlled Substances Act punishable by a maximum term of imprisonment of ten years or more. *See* 18 U.S.C. § 3142(e)(3)(A).

"Once the statutory presumptions are raised, the defendant carries the burden of production to come forward with evidence" showing that he is "either

4

not dangerous or not likely to flee if turned loose on bail." *United States v. Quartermaine*, 913 F.2d 910, 916 (11th Cir. 1990) (citation modified). Even if the presumption is rebutted, it "remains in the case as an evidentiary finding militating against release, to be weigh[ed] along with other evidence relative to factors listed in section 3142(g)." *Id.* (quoting *King*, 849 F.2d at 488).

Though the burden of production shifts to the defendant, the burden of persuasion remains with the United States to establish by a preponderance of the evidence that the defendant presents an unavoidable risk of flight, or by clear and convincing evidence that the defendant poses an unavoidable risk of danger. *See id.*; *United States v. Kachkar*, 701 F. App'x 744, 746 (11th Cir. 2017) (per curiam) (risk of flight) (citing *King*, 849 F. 2d at 489); 18 U.S.C. § 3142(f)(2)(b) (risk of danger); *see also United States v. Megahed*, 519 F. Supp. 2d 1236, 1249 (M.D. Fla. 2007). To assess flight risk and dangerousness, a district judge must consider the (1) nature and circumstances of the charged offense; (2) weight of the evidence; (3) history and characteristics of the person; and (4) nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

## III. ANALYSIS

The presumption of detention applies because a grand jury indicted Roman with charges under 21 U.S.C. § 841 that carry a maximum sentence of forty years. *See* Indict. at 1–2; 21 U.S.C. § 841(b)(1)(B)(ii) (providing the

5

sentencing range for crimes involving 500 grams or more of a substance with detectable amounts of cocaine); *Quartermaine*, 913 F.2d at 916 ("A grand jury indictment provides the probable cause required by the statute to trigger the presumption."). Even if I assume that Roman rebutted the presumption, detention is warranted because the government has shown that no conditions of release would both reasonably assure Roman's future appearance and the safety of others or the community.

### A. The Nature and Circumstances of the Charged Offenses Favor Detention

Roman is charged with serious drug crimes that carry substantial terms of imprisonment, which increase the risk of flight and that are inherently dangerous to the community. Further, the government's evidence of Roman's own flight during the incident giving rise to the charges indicates that Roman poses a likelihood of flight in the future.

Under section 3142(e), "those charged with narcotics offenses often pose an especially high risk of flight." *King*, 849 F.2d at 488. This case is no exception. The sentencing exposure, which ranges from five up to forty years, gives substantial incentive to flee.[1] *See* Hr'g; Mot. at 8. Roman has a criminal record involving drugs and firearms. *See* Bail Report at 3–5. But he admits

---

[1] Counsel for the United States anticipates that, if convicted, Roman would likely receive more than the minimum sentence given the allegations that Roman played a leading, rather than mitigating, role. Hr'g.

that, until his most recent period of detention in the state system, he had never had "a substantial incarceratory sentence." Resp. at 3. Because the federal government intervened when his state sentence was concluding, he "has never . . . be[en] released from custody after serving a substantial sentence." *Id.* at 3–4. His bail report indicates that, until this recent period of detention, Roman spent no more than a couple months in jail in total, and was never sentenced to more than one day in jail. Bail Report (Doc. 24) at 3–5. Roman contends that he is less likely to flee because his prior offenses were less serious than the current ones. *See* Resp. at 3–4. The exact opposite is true. Roman, perhaps for the first time, faces a lengthy sentence, which provides a greater incentive to flee.

In addition, Roman's alleged flight during the operation demonstrates a propensity to flee from law enforcement. According to the government, nearly an hour went by after Roman first drove past his cousin's house before he pulled into the driveway to pick up the drugs. Mot. at 3–4. This means that Roman had time to reconsider and elected to continue the drug pick-up, despite twice suspecting law enforcement in the area. Roman's subsequent flight then was not the panicked response of someone caught completely off-guard. Even if it were, Roman did not later turn himself in. This willingness to flee after premeditation indicates a high risk of flight in the future, particularly now that he faces lengthy incarceration.

7

Finally, the charged offenses involve cocaine sourced from Puerto Rico. As discussed below, Roman is from Puerto Rico, has extensive and close familial ties there, visits Puerto Rico, and is fluent only in Spanish. Thus, the nature of these drug charges themselves confirm a ready destination to which Roman might flee with ease.

For the above reasons, the nature and circumstances of the offense indicate a high risk of flight.

## B. The Strength of the Evidence Favors Detention

The strength of the evidence also favors detention. Roman questions whether the government can prove that he arrived to pick up the drugs from his cousin because the officers could not see the driver's face through the car's tinted windows. Hr'g. But the government has strong evidence, including his cousin's cooperation, phone records, and the uncontested fact that the vehicle was registered to Roman's fiancée. *Id.*; Mot. at 3. The Postal Inspectors likewise corroborated the cousin's account by searching postal databases and "connected [Roman] to at least six parcels sent from Puerto Rico to the two addresses in Zephyrhills" between February and July 2023. Mot. at 4. Roman offered no evidence to rebut any of the above. There is strong incentive to flee based on the strength of the government's case.

### C. Roman's History and Characteristics Favor Detention

Roman's criminal history cuts decidedly in favor of detention. Roman's record shows recidivist tendencies related to drug and firearms, reducing his argument that he does not pose a danger to the community. Finally, Roman's ties to Puerto Rico and ability to secure funds show that he has the means to abscond.

Roman's record of drugs and firearm convictions, as well as probation violations, counsel strongly against release. He was born in Puerto Rico, where he lived until he moved to Florida as an adult in 2013. Hr'g; Bail Report at 1. Between 2014 and 2024, Roman acquired at least twelve state-level criminal charges. *Id.* at 3–5. In 2018, he was found guilty of several crimes, including possession of a firearm in commission of a felony, possession of marijuana with intent to sell, and the purchase of cocaine. *Id.* at 3–4. He appears to have spent six weeks in jail awaiting bond and was sentenced to one day in jail, followed by three years of probation. *Id.* His bail report lists two violations of probation during this time. *Id.* at 4. One was a "[t]echnical violation" for traveling to Puerto Rico without authorization, and the other was a positive drug test. *Id.* The bail report says that a violation was dismissed, but it is not clear which one.[2] *Id.* In 2023, Roman pleaded nolo contendere to possession of ammunition

---

[2] Roman testified at the hearing that he in fact received permission to travel to Puerto Rico but there was a mix-up about the paperwork required. Hr'g.

by a convicted felon, possession of drug paraphernalia, marijuana possession, and petit theft. *Id.* at 4. Again, he was sentenced to one day in jail and was put on probation. *Id.* Less than a year later, Roman violated his bail and incurred charges for possession of a firearm and possession of ammunition by a convicted felon. *Id.* The violation resulted in the eighteen-month detention that he recently completed before being transferred to federal custody to await resolution of this indictment. Mot. at 5. This record strongly suggests that no conditions of release will reasonably prevent him from re-offending and thus posing a danger to the community.

Lastly, Roman's strong ties to Puerto Rico indicate his ability to abscond. He does not need a passport to go there, and Roman is comfortable there. His father, brothers, and other family members still live there, and he prefers to speak the predominate language, Spanish, as shown by his use of a translator during the hearing and communications with his cousin over the phone during the events leading to this indictment. Hr'g. Finally, Roman's alleged trafficking of drugs from Puerto Rico demonstrates that he has criminal ties there, which could facilitate flight (and recidivism). Thus, not only does Roman present a serious risk of flight, but doing so would be relatively easy.

10

### D. The Nature and Seriousness of the Danger to the Community Posed by Release Warrant Detention

The nature and seriousness of the danger to the community posed by Roman's release cut strongly in favor of detention. Given Roman's criminal history and the strength of the government's case at hand, a substantial risk of Roman's continued involvement with cocaine possession and distribution persists. *See* Bail Report at 3–5. Cocaine is lethal. According to statistics cited in the government's brief, cocaine was the second-most lethal drug in Florida between January and June 2023 after fentanyl. *Id.* Roman's counsel countered at the hearing that Roman is not likely to re-offend due to the possible consequences, and Roman offered testimony from his fiancé and mother that he does not have a reputation in the community as a dangerous person. Hr'g.

The government has the better argument. Cocaine poses a direct, grave threat to the community. Based on the strength of the government's evidence, Roman presents a risk of re-offending. According to unrebutted evidence, this was not the first time that Roman trafficked suspicious packages. Roman's cousin told law enforcement that this was the fourth package she had facilitated on his behalf, and the government corroborated her claim. Mot. at 2, 4. Roman's criminal record likewise suggests that he poses a danger based on his prior cocaine and firearm-related convictions. *See* Bail Report at 3–5. This demonstrates a pattern of activity and a proclivity to re-offend. The

11

nature and seriousness of the risk to the community are grave and warrant detention.

### E. No Conditions of Release Would Sufficiently Mitigate Risks

No conditions of release would sufficiently mitigate the risk that Roman flees or endangers others. Roman points to his strong community ties, proposed conditions of release, past court appearances, employment, and lack of passport to assure the Court. Specifically, Roman proposes that he be released to live with his fiancée, Kristal Del Rocio Ramos Ayala, or with his mother, Nancy Roman, and that either of them could serve as a custodian. Neither suffices. Nor do the other considerations ensure his later appearance.

Prior to his detention, Roman lived with Ayala and her three children during the better part of ten years, at least between 2016 and 2023. Hr'g. During this time, including while the children were young, Roman incurred cocaine, marijuana, and gun-related convictions. *Id.*; *see* Bail Report at 3–5. For her part, Ayala testified that she was unaware of Roman's criminal behavior because she was occupied with a busy work schedule and caring for her children. Hr'g. She also represented that she and Roman broke-up in 2023 and have reunited now that he is in custody, though this is inconsistent with her prior testimony before the magistrate judge that they reconciled before Roman's arrest. *See* Release Order at 4.

Ayala contends that she could minimize her work hours if necessary and offered her vehicle as a secured bond to ensure his return to court and reduce any danger to the community. Hr'g. I do not find that sufficient in the light of Roman's criminal history while living with Ayala—and the strength of the government's evidence that Roman used her vehicle while committing the charged conduct. Nor is their relationship particularly stable: both testified that they separated prior to his recent arrests and reunited only after he was incarcerated. *Id.* But the most concerning facts elicited at the hearing were either not apparent or not highlighted earlier in the action. These include that all of Roman's criminal behavior between 2014 and 2024 occurred when he was living with either Ayala or his mother; that Roman allegedly used his fiancée's car to commit the charged offenses; and that Roman's relationship with Ayala has historically been unstable.

Roman's second proposal, that he move in with his mother fares no better. Roman's mother testified that she could leave her job as a cashier to watch over him and ensure compliance with court obligations. Hr'g. I do not question her sincerity, but the efficacy of her custodianship. Some of Roman's earlier offenses occurred while living with her in the past and nothing suggests that would not continue.

Neither do Ayala or Nancy Roman's unsecured signature bonds of $50,000 (which they signed as part of the release conditions before the

13

magistrate judge) negate the risks of flight or danger to the community.[3] *See* Release Order at 3–4; Appearance Bond (Doc. 41-1). Nancy Roman testified that she currently has approximately $15,000 plus a car that might be worth $6,000, implying that she could post a different kind of bond if the $50,000 signature bond was insufficient. Hr'g. But whether an unsecured signature bond or one with minimal collateral, the threat of a money judgment is not coercive enough to ensure Roman's later appearance. *Cf. Schultz v. Alabama*, 42 F.4th 1298, 1324 (11th Cir. 2022) (explaining that pretrial detainees who could not afford to pay the bail amount did not "ensure in the first instance their future appearance at trial"). In any event, even if either woman could secure the bond or pay any judgment arising from Roman's failure to comply with pretrial release conditions, Roman could always "flee the jurisdiction and then reimburse those persons whose property would be forfeited." *See United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985), *aff'd*, 853 F.2d 928 (11th Cir. 1988). Roman himself, seemingly for the first time, offered two trucks as security, which he estimated to total between $40,000 and $45,000

---

[3] Under the bond agreement, the Court may order Nancy Roman and Ayala to pay $50,000, plus interest and costs, if Roman violates any condition of his pre-trial release, fails to appear in court, or fails to surrender to serve a sentence if he is ultimately convicted. Appearance Bond at 1–2. Nancy Roman and Ayala signed an "unsecured" bond as opposed to a "secured bond." *Id.* The latter provides a stronger guarantee that the surety will be able to pay the bond if necessary because it obligates the surety to protect the property (and to refrain from selling it) while the agreement is in place. *Id.* at 2.

in value. Hr'g. But when facing more than a decade of incarceration, forfeiting his business vehicles does not satisfy the Court either.

None of the other proposed conditions or considerations assure the Court. Given the surreptitious nature of drug-trafficking, for which Roman needs little more than a cellphone, a curfew or location monitoring do little to prevent Roman from harming the community. *See* Resp. at 1 (suggesting a bond, curfew, and location monitoring). Similarly, Roman's history of court appearances, employment with this towing and parking rental company, and lack of a passport fail to overcome the strong evidence of flight risk. That Roman appeared in state court after receiving minimal punishment sheds little light on the likelihood that he will appear in federal court when facing more than a decade in prison. Though Roman's business suggest that he could earn an income, it does not meaningfully change the risk of flight analysis or the harm to the community. *See* Hr'g. And the lack of passport does not prevent travel to Puerto Rico, where Roman is from and has substantial ties.

There is no condition or combination of conditions that sufficiently mitigate the risk of flight or danger to the community. In the light of the factors described above, the following is **ORDERED:**

1. The United States' motion for revocation of the release order (Doc. 42) is **GRANTED**.

2. The Magistrate Judge's release order (Doc. 41) is **REVOKED.**

15

3. Roman is **DETAINED** pending resolution of this criminal case. Roman is committed to the custody of the Attorney General for confinement in a corrections facility. Roman shall be afforded a reasonable opportunity for private consultation with defense counsel. On Order of a Court of the United States or on request of an attorney for the government, the person in charge of the corrections facility shall deliver the defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

**ORDERED** in Tampa, Florida, on February 6, 2026.

Kathryn Kimball Mizelle
United States District Judge

16